## JOHN N. KERNAN v. JOHN GRIFFITH.

SWAMP AND OVERFLOWED LANDS.—The Act of Congress of September 28, 1850, granting to California the swamp and overflowed lands within the State, vested in said State the absolute ownership of all of said lands then undisposed of, and the title of the State in no way depends upon the issuance of a patent to the State by the United States.

SAME.—The State of California, since the 28th day of September, 1850, has had the absolute power of selling the swamp and overflowed lands within its limits.

SAME.—The Government of the United States has no right to determine by an *ex*

*parte* survey of its own what are and what are not swamp and overflowed lands in this State.

EVIDENCE AS TO LAND BEING SWAMP OR OVERFLOWED.—One who claims a tract of land under a patent issued to him by this State, conveying the same as swamp and overflowed land is not bound, in an action of ejectment brought by him against one claiming under the Homestead Act, by a survey of the United States designating the same as high land, but may introduce evidence of the real character of the land.

SAME.—The fact, whether a given tract of land is swamp or overflowed, or dry land, cannot be determined by the separate decision of either the State or the United States, but must be settled by evidence given in the course of judicial proceedings.

APPEAL from the District Court, Fifth Judicial District, San Joaquin County.

Defendant recovered judgment in the Court below, and plaintiff appealed.

The other facts are stated in the opinion of the Court.

*John B. Hall,* for Appellant.

*Tyler & Cobb,* for Respondent.

By the Court, SHAFTER, J.

This was an action of ejectment, brought to recover the possession of the northwest quarter of Section Number Seventeen, in Township Number Three south, Range Seven east, according to the surveys of public lands of the United States, in the County of San Joaquin.

The plaintiff claimed by title derived from John D. Winters, to whom the lands were patented by the State as swamp and overflowed lands, January 15, 1856, and who had purchased them under the Act of April 28, 1855. This claim the plaintiff sustained, *prima facie,* at the trial, by the introduction of the patent and a series of mesne conveyances terminating in himself.

The defendant, having proved that he, on the 20th of February, 1864, duly entered the lands in question in the office of the Register of the United States Land Office for the Stock-

ton District, under the Homestead Act of 1862, gave, in evidence, the map of the survey by the Government of the United States of the township embracing the quarter section in controversy. The survey, from which said map was prepared, was made in December, 1854, and was approved by the Surveyor-General of the United States for the State of California, June 15, 1857, sixteen months after the issuing of the patent to Winters. It appeared by the map that the quarter section in dispute was high land, and not swamp and overflowed. The Court instructed the jury that the character of the lands was established conclusively by the Government survey, and under that instruction the jury returned a verdict for the defendant. The question is upon the correctness of that instruction.

The instruction was erroneous. The title of the State to the swamp and overflowed lands within its limits, was derived from the General Government under the Act of September 28, 1850. It was held in *Summers* v. *Dickinson*, 9 Cal. 554, that upon the passage of the Act of Congress referred to, the State became the absolute owner of all the swamp lands within her limits which had not been disposed of, and that the title of the State in no way depended upon a patent, the Act itself operating as a full and perfect conveyance *in præsenti*. The Court arrived at the same conclusion in *Owen* v. *Jackson*, 9 Cal. 322, further holding, however, that a patent issued to the State under the second section of the Act, would have no operation except by way of further assurance. These decisions are not only in harmony with the language of the Act, when properly construed, but are fully sustained by the case of *Foley* v. *Harrison*, 15 How. 447, and the case of *Wilcox* v. *Jackson*, 13 Pet. 516. As late as November, 1858, Mr. Attorney-General Black, in an official communication to the Secretary of the Interior, held that "it was not necessary that a patent should issue in order to vest the title under the Act of September 28, 1850;" and in repeated instances circulars have been issued from the Department of the Interior in which the same view of the effect of the grant has been

12

taken. In view of these authorities we are not at liberty to consider the question as an open one.

If the grant to the State was absolute, clothing the State presently with the "absolute power of disposing" of the lands falling within the description contained in the grant, as was held in the two cases cited from the 9th Cal., it follows that neither the United States, the grantor, nor the State, the grantee, could by any *ex parte* survey, or other proceeding of like character, determine or in any manner affect the rights of the other. True, by the second section of the Act of 1850, the Secretary of the Interior is directed, as soon as may be practicable after the passage of the Act, to make out a list and plats of the swamp and overflowed lands granted, and to transmit them to the Governors of the States respectively in which the lands may be situated; but this is a purely ministerial service, to be performed by the Secretary, not as agent of both parties, but as agent of the Government, and to enable it to advise itself as to the more minute description to be inserted in the further assurance which it proposed to give, and which the State might or might not call for in the election of the Governor. It is doubtful if the survey, which the Court below considered as decisive, was even admissible in evidence, but to hold that it concluded the rights of the plaintiff by its own vigor, would be to hold that the Act of 1850 contained a reservation of a power to the Government to defeat its own grant *in toto*, and that all the cases cited are erroneous. Did the grant, in fact, contain a stipulation of the character named, the saving would, on the principles of the common law, be null and void, on the ground that it would be utterly repugnant to the body of the Act. (1 Black. Com. 89.)

It is urged, on the part of the respondent, that the Act of Congress admitting California into the Union, states as a condition, that the people, through their Legislature or otherwise, shall never interfere with the primary disposal of the public lands within its limits. The Act was passed on the 9th of September, 1850, and thereafter, on the 28th of the same

month, Congress, in the full exercise of its admitted powers, granted to the State absolutely all the public lands therein that were then swamp and overflowed; thereby presently segregating them, by clear and apt description, from the mass of the public domain, and reducing them to private ownership; and therefore, a survey of those lands thereafter by the Government cannot be considered as having any just relations to the power reserved to the United States by the Act under which California came into the Union.

The State has heretofore and is now determining for itself the position and extent of the swamp and overflowed lands within its limits, and is now, and has been since 1855, making sales and conveyances thereof, and those sales now amount to about one million of acres. On the other hand, the General Government has, by its own independent action in the prosecution of the public surveys, been engaged in determining for itself the location of the same lands, not with a view, however, of claiming them as its own, but with a view of disclaiming them whenever their exact extent and position should be ascertained to its satisfaction. Neither of the parties is bound by the action of the other. It is not the uncommon case of grantor and grantee making surveys respectively of the lands granted, which surveys are not in agreement with each other. In such case, if each party, assuming the correctness of his own survey, makes a conveyance on the basis of it, and the holders of the respective deeds fail to harmonize the conflict of titles between them, the controversy is to be determined by the Courts in due course of proceedings. In cases like the one at bar, the question will be, as it is here, a question of fact: Were the lands "swamp and overflowed" on the 28th of September, 1850, the date of the Government grant? And that question must always be responded to by the jury on evidence submitted to them and applicable to the question.

Judgment reversed and cause remanded.